J. S83013/16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

IN RE:  E.G.J., A/K/A E.J., A MINOR : IN THE SUPERIOR COURT OF
            :   PENNSYLVANIA
            :
APPEAL OF:  T.J., BIRTH FATHER :   No. 776 WDA 2016

Appeal from the Order Entered May 3, 2016,
in the Court of Common Pleas of Allegheny County
Orphans' Court Division at No. CP-02-AP-0000011-2016

IN RE:  B.V.J., A/K/A B.J., A MINOR : IN THE SUPERIOR COURT OF
            :   PENNSYLVANIA
            :
APPEAL OF:  T.J., BIRTH FATHER :   No. 777 WDA 2016

Appeal from the Order Entered May 3, 2016,
in the Court of Common Pleas of Allegheny County
Civil Division at No. CP-02-AP-0000010-2016

BEFORE:  FORD ELLIOTT, P.J.E., SHOGAN AND STRASSBURGER,* JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:   **FILED JANUARY 06, 2017**

  T.J. ("Father") appeals from the orders dated May 2, 2016, and entered May 3, 2016,[1] in the Court of Common Pleas of Allegheny County, Orphans' Court Division, granting the petition of the Allegheny County Office

---

* Retired Senior Judge assigned to the Superior Court.

[1] While the order was dated May 2, 2016, notice pursuant to Pa.R.C.P. 236 was not provided until May 3, 2016.  ***See Frazier v. City of Philadelphia***, 735 A.2d 113, 115 (Pa. 1999) (holding that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given").

of Children, Youth and Families ("OCYF") and involuntarily terminating his

parental rights to his dependent children, daughter, E.G.J., born in March of

2008, and son, B.V.J., born in August of 2006 (collectively, the "Children"),

pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).[2]

After review, we affirm.

The trial court summarized the relevant procedural and factual history,

in part, as follows:

> OCYF became involved with this family on June 19,
> 2014, subsequent to allegations made by the oldest
> sibling, J.J., that Father was sexually abusive.
> Father was charged in criminal court and was
> ordered as a term of his bond to leave the home and
> have no contact with his children.[3]  At a forensic
> interview on September 2, 2014, OCYF learned that
> Father stayed overnight in the family's home.  Father
> was arrested for Violation of Bond and Mother was
> arrested for Endangering the Welfare of Children.
> The Children were placed with family members.
>
> On October 17, 2014, the Children were placed
> with their Maternal Aunt [] at Mother's request and
> have since remained in her care.[4]  On November 7,

---

[2] By the same orders, the trial court also involuntarily terminated the parental rights of Children's mother, R.J. ("Mother"), also pursuant to Sections 2511(a)(2), (5), (8), and (b).  Mother has filed appeals at Superior Court Docket Nos. 780 and 781 WDA 2016, addressed by separate memorandum.

[3] A criminal no contact order was in place with regard to Father and J.J. Mother was to supervise any contact between Father and the other children. (Notes of testimony, 5/2/16 at 11-12.)

[4] Children were initially informally placed with extended family members following Mother's arrest in September 2014.  Children were then placed with maternal aunt in Ohio on October 17, 2014.  (Notes of testimony, 5/2/16 at 13-16.)

2014, the Children were adjudicated dependent as to Father due to substantiated allegations of sexual abuse against him by J.J.[5] Father did not receive any treatment for sexually offending and continued to have contact with the other children. The Family Services Plan (hereinafter, "FSP") did not provide Father with goals. Father's criminal attorney informed [OCYF] that Father would not cooperate with OCYF. Father was ordered by this Court to complete a risk assessment and have no contact with the Children.

At a hearing on February 13, 2015, this Court determined that Father was not acknowledging the sexual abuse of his oldest child. In May of 2015, the Children alleged sexual abuse by Father. The charges surrounding these allegations were later withdrawn. The Children continued to allege abuse against Father after the initial claims were made.[6]

On August 20, 2015, Father was convicted of sexual abuse against J.J. and incarcerated. Father was sentenced "to be confined for a minimum period of 66 Month(s) and a maximum period of 160 Month(s)" for the offense of Rape Forcible Compulsion. He was to "be confined for a minimum period of 30 Month(s) and a maximum period of 60 Month(s)" for the offense of Statutory Sexual Assault. Additionally, Father received a sentence to "be confined for a minimum period of 24 Month(s) and a maximum period of 48 Month(s)" for Incest. Father was placed on probation for Corruption of Minors, Endangering the Welfare of Children, and Indecent Assault of a Person Less than 16 Years of Age. Father will have a lifetime registration under

---

5 Children's three older siblings, who are placed separately, were also adjudicated dependent. In adjudicating Children dependent, the court additionally considered the behavior of Mother. (Notes of testimony, 5/2/16 at 18-20.)

6 Children additionally made allegations against Mother. These allegations, however, were unfounded. (Notes of testimony, 5/2/16 at 47-48.)

Megan's Law as a Tier 3 offender. Father has since remained incarcerated.

Prior to November 2015, Father was not permitted to have contact with the Children. On November 20, 2015, this Court permitted Father to write letters to the Children to be read during their therapy sessions if their therapist deemed them appropriate. . . .

Trial court opinion, 7/25/16 at 3-5 (footnotes omitted and citations to record omitted).

On January 25, 2016, OCYF filed petitions to involuntarily terminate parental rights. Thereafter, the trial court conducted a hearing on May 2, 2016.[7] In support of the termination petitions, OCYF presented the testimony of Clare Chiaverini, CYF caseworker; Dr. Beth Bliss, licensed psychologist, who performed a risk assessment of Father and individual and interactional evaluations of Children, Mother, and Maternal Aunt;[8] and Sophia Sparks, Children's therapist. Mother testified on her own behalf. Mother additionally presented the testimony of her brother, S.M. Father, who is incarcerated, was present, but did not testify.

---

[7] A permanency review hearing with regard to Children's three older siblings was also conducted at this time.

[8] Dr. Bliss' assessments and/or evaluations were completed on November 24, 2014, September 29, 2015, and April 8, 2016, and were marked and admitted collectively as OCYF Exhibit 5 at the hearing on May 2, 2016.

By order dated May 2, 2016, and entered May 3, 2016, the trial court involuntarily terminated Father's parental rights to Children.[9] On May 31, 2016, Father, through counsel, filed timely notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Father raises the following issue for our review:

> Did the trial court abuse its discretion and/or err as a matter of law in concluding that [OCYF] met its burden of proving that termination of Birth Father's parental rights would meet the needs and welfare of the Child pursuant to 23 Pa.C.S.[A. §] 2511(b) by clear and convincing evidence?

Father's brief at 7.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties

---

[9] The trial court announced its decision, memorialized by subsequent order, on the record at the conclusion of the hearing on May 2, 2016.

> spanning multiple hearings. *See In re R.J.T.*, 9 A.3d [1179, 1190 (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is guided by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*), quoting *Matter of Adoption of Charles E.D.M. II*, 708 A.2d 88, 91 (Pa. 1998).

In this case, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), and (8), as well as (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, Father concedes grounds for termination under Section 2511(a)(2). (*See* Father's brief at 15.) We, therefore, analyze the court's termination pursuant to Section 2511(b) only, which provides as follows:

> **(b)  Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described

> therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

With regard to Section 2511(b), our supreme court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M.*, 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267. "[I]n cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa.Super. 2010) (citations omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010), citing

*In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa.Super. 2008) (internal citations omitted).

Moreover,

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa.Super. 2015), quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011) (quotation marks and citations omitted).

Instantly, in examining Section 2511(b) and determining whether termination of Father's parental rights serves Children's needs and welfare, the trial court emphasized Father's lack of bond with Children due to lack of contact; safety concerns as a result of Children's consistent allegations of abuse against Father and fear of Father; the negative psychological impact of the proceedings and alleged abuse on Children; and Children's positive relationship with Maternal Aunt. (Trial court opinion, 7/25/16 at 6-10.) The trial court reasoned:

> Here, this Court judiciously evaluated the bond between Father and the Children and determined

that there was no indication that an emotional bond exists to the extent that the termination of parental rights of Father would cause the Children to suffer extreme emotional consequences. In reaching this conclusion, this Court weighed the totality of the circumstances and relied upon the testimony of OCYF Caseworker, Ms. Chiaverini, counselor for the Children, Ms. Sparks, and Dr. Bliss.

The Children have been out of the care of both parents since September of 2014. This is a significant period of time in which the Children have had little contact with Father. . . .

. . . .

Ms. Sparks testified that the Children have mixed emotional reactions to Father's letters that they have read during therapy sessions. B.J. stated that ". . . it makes him remember things that have happened that he doesn't want to remember." Ms. Sparks is concerned about the stress, anxiety, and fear that the Children experience surrounding this contact with Father. While Father has continued to write letters to the Children, this is merely passive contact between Father and the Children. This Court does not believe that the superficial relationship arguably established by the letters is demonstrative of or akin to a parent-child relationship.

. . . .

This Court determined, based on the testimony of Ms. Sparks and Dr. Bliss, that the Children would be unsafe if they had contact with Father. The Children have continued to allege sexual abuse against Father. . . . Ms. Sparks testified that the Children's allegations made against Father have been consistent over time. The Court credited Ms. Sparks' testimony that the Children fear their Father and that severing this relationship would not cause extreme emotional consequences. The Children have consistently alleged that they were abused by Father and repeatedly expressed fear that it would happen

again. This Court believes that the Children would be harmed if contact were to continue between them and their Father.

During Father's risk assessment on November 24, 2014, Dr. Bliss described that Father "was cautious regarding talking about sexual abuse allegations. . ." In the personality test portion of the evaluation, Dr. Bliss testified that ". . . he responded in a guarded and defensive manner. He was not willing to admit to even normal levels of any problems." This Court believes that Father's defensive response to the evaluation questions asked by Dr. Bliss raises concerns regarding his ability to assume responsibility for his actions. Dr. Bliss recommended that Father attend individual outpatient counseling and, if he was found guilty of the alleged sexual offenses, sex offender treatment. Father has failed to participate in any form of therapy despite Dr. Bliss' recommendation.

With regard to the Children's evaluations, Dr. Bliss testified that B.J. was diagnosed with Post Traumatic Stress Disorder (PTSD) attributed to the events surrounding their current OCYF case and the alleged abuse. Dr. Bliss also testified that E.J. was diagnosed with adjustment disorder attributed to the same circumstances. These mental health diagnoses in addition to the Children's disclosure that they are fearful of their Father are significant and were weighed heavily in this Court's decision to terminate rights.

The Children have clearly expressed their desire to continue residing with [Maternal Aunt]. Dr. Bliss believes that the Children would be traumatized if they were removed from [Maternal Aunt]'s home. Dr. Bliss recommended "that [the Children] remain with their aunt." Ms. Chiaverini continues to assert that it is the agency's position that termination of parental rights would meet the needs and welfare of the Children. Ms. Chiaverini testified that the Children ". . .are doing well in their foster home. They seem to be bonded to their foster

> family. They seem to feel safe there." Dr. Bliss testified that the relationship between [Maternal Aunt] and the Children is not the same as a parent-child relationship, however, she clarified that is because they were primarily raised by their Mother and Father. Dr. Bliss asserted that the Children and [Maternal Aunt] demonstrated a very close and positive relationship.
>
> The evidence presented established that the Children share a significant bond with [Maternal Aunt]. Continued contact with Father would not serve either child. Therefore, considering the totality-of-the-circumstances, this Court concludes that the developmental, physical, and emotional needs and welfare of the Children would be best served by terminating Father's parental rights.

Trial court opinion, 7/25/16 at 6-10 (footnote omitted and citations to record omitted).

Father, however, argues that a bond was present between him and Children. (Father's brief at 17.) Further, Father indicates that the trial court improperly focused on Children's continued allegations of sexual abuse against him, as well as his "defensive" behavior when questioned by Dr. Bliss. (*Id.* at 18.) Father avers that the trial court failed to examine the emotional trauma that Children may suffer if his parental rights are terminated, instead concentrating on the impact of maintaining Father's parental rights.[10] (*Id.* at 19.) We disagree.

---

[10] While Father does not complete this thought in his brief, we, however, do not hold this against him.

Upon review, the record supports the trial court's finding that Children's needs and welfare favor termination of Father's parental rights. Children had been out of Father's care for almost two years and only had limited letter contact through and as deemed appropriate by their therapist for six months.[11] (Notes of testimony, 5/2/16 at 13-16, 29-20.) Children consistently made allegations of abuse against Father and expressed a fear of returning home and lack of safety. (*Id.* at 34-35, 130-131, 133, 135, 176-177, 181, 190, 192, 210, 225.) In addition, B.V.J. was diagnosed with post-traumatic stress disorder and E.G.J. with adjustment disorder related to the alleged abuse and/or involvement of OCYF. (*Id.* at 190, 192-193, 221.) Symptoms centered around court appearances, evaluations, or family visitation and/or contact. (Notes of testimony, 5/2/16 at 139, 145-146; 189-190; Exhibit 5, Psychological Evaluation 4/8/16, report dated 4/13/16, at 17, 18, 20.) As a result, Children ultimately desire limited future contact with Father. (*Id.* at 190; 19.)

Moreover, and more importantly, Children feel safe with and want to remain with Maternal Aunt, with whom Dr. Bliss observed they are bonded and have a "positive," "close" relationship. (*Id.* at 130, 133, 136, 138-139, 144, 149-150, 179, 184, 185, 196; 19.) E.G.J., in particular, "appeared

---

[11] Although Dr. Bliss references E.G.J.'s report of text messages from Father, there is no further substantiation of such contact in the record, nor does the record reveal the identity of parties to such contact. (Exhibit 5, Psychological Evaluation 4/8/16, report dated 4/13/16, at 10.)

strongly bonded" to Maternal Aunt. (***Id.*** at 197; 19.) As such, Dr. Bliss opined that Children should remain in Maternal Aunt's care. (***Id.*** at 223-224; 20.) Thus, we conclude that the trial court did not abuse its discretion in finding termination of Father's parental rights serves Children's needs and welfare pursuant to Section 2511(b).

Accordingly, based on the foregoing analysis of the trial court's termination of Father's parental rights, we affirm the orders of the trial court.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  1/6/2017